**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| Q.C-C., *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 15-00400 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 9, 11 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiffs R.C. and M.C. brought this action on behalf of themselves and their daughter Q.C-C.[1] under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA") against Defendant the District of Columbia (the "District").  Plaintiffs appeal from an administrative decision that, in relevant part, found that the District of Columbia Public Schools ("DCPS") denied Q.C-C. a free appropriate public education as required by the IDEA but declined to order the relief requested by Plaintiffs.  Before the Court are the parties' cross-motions for summary judgment.  *See* Pls.' Mot. Summ. J., ECF No. 9; Def.'s Opp'n Pls.' Mot. Summ. J. & Def.'s Cross-Mot. Summ. J., ECF No. 11.  For the reasons provided below, the Court will grant Plaintiffs' motion and deny the District's motion.

---

[1]     The Court has permitted Plaintiffs to proceed anonymously in this action pursuant to Rule 5.2 of the Federal Rules of Civil Procedure and Local Civil Rule 5.1(h).  *See* Order, ECF No. 3.

## II.  BACKGROUND

The Court begins by providing an overview of the framework of the IDEA before turning

to the factual background and procedural history of this case.

### A.  Statutory Framework

Under the IDEA, "every child with a disability in this country is entitled to a 'free

appropriate public education,' or FAPE."  *Leggett v. District of Columbia*, 793 F.3d 59, 62 (D.C.

Cir. 2015) (quoting 20 U.S.C. § 1400(d)(1)(A)).  The "primary purpose" of the Act is "'to ensure

that all children with disabilities have available to them a[n] . . .  education that emphasizes

special education and related services designed to . . . prepare them for further education,

employment, and independent living.'"  *Id.* (quoting 20 U.S.C. § 1400(d)(1)(A)) (alteration in

original).  "A free appropriate public education entitles 'each child with a disability' to an

'individualized education program' that is tailored to meet his or her unique needs."  *Henry v.*

*District of Columbia*, 750 F. Supp. 2d 94, 96 (D.D.C. 2010) (quoting 20 U.S.C. §§

1414(d)(1)(A)–(2)(A)).

The individualized education program (the "IEP") is the "primary vehicle" for

implementing the IDEA.  *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C.

Cir. 2006).  The IEP is "[p]repared at meetings between a representative of the local school

district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled

child."  *Id.*  It "sets out the child's present educational performance, establishes annual and short-

term objectives for improvements in that performance, and describes the specially designed

instruction and services that will enable the child to meet those objectives."  *Id.*

When the parents of a student with a disability are dissatisfied with a school district or

agency's "identification, evaluation, or educational placement of the child, or the provision of a

free appropriate public education to such child," 20 U.S.C. § 1415(b)(6), the IDEA entitles them

to present their arguments in an "impartial due process hearing," *id.* § 1415(f).  Any party

aggrieved by the hearing officer's determination may bring a civil action in state or federal court.

*See id.* § 1415(i)(2).  The IDEA also contains a "stay put" provision, which provides that during

the pendency of any of these proceedings, the student must remain in his or her current

educational placement unless otherwise agreed.  *See id.* § 1415(j).

### B.  Factual Background

Q.C-C. is a minor living in the District of Columbia with her parents, who adopted her

from Guatemala when she was an infant.  *See* AR 379.  Q.C-C. has been diagnosed with

Attention Deficit Hyperactive Disorder ("ADHD"), a phonological disorder, Mixed Receptive-

Expressive Language Disorder, a reading disorder, and a disorder of written expression.  *See* AR

384; AR 750.

From kindergarten through the fourth grade, Q.C-C. attended Oyster-Adams Bilingual

School ("Oyster-Adams"), a public school within the DCPS system.  *See* AR 383; AR 750.  In

March and April 2010, while Q.C-C. was in the third grade at Oyster-Adams, DCPS conducted a

psychological evaluation of Q.C-C. and determined that she was eligible for special education

and related services pursuant to the IDEA as a student with a disability classification of "Other

Health Impairment."  *See* AR 262; AR 750–51.  As a result, Q.C-C. received some limited

additional support during the remainder of the school year.  *See* AR 751.  Q.C-C.'s fourth grade

year at Oyster-Adams, the 2010–2011 school year, was "rough" for her both academically and

socially.  AR 751.  She struggled in all but one of her classes, was bullied, and lost friends and

self-esteem.  *See id.*

Q.C-C.'s parents, concerned about her difficulties in fourth grade, engaged the services of a special education consultant, Dr. Laura Solomon.  *See id.*; Tr. Day 1 at 37:8–22, ECF No. 8-8; AR 261–75 (Diagnostic Educational Evaluation by Dr. Solomon dated Feb. 13, 2011).  In February 2011, Dr. Solomon observed Q.C-C. in classes at Oyster-Adams, reviewed her educational records, conducted tests, and interviewed her parents.  *See* AR 263–74; AR 751.  Dr. Solomon concluded that Q.C-C. "requires a more intensive program than she is currently receiving."  AR 274; *see also* AR 751.  Noting that Q.C-C. had ADHD, "significant dyslexia" and "multiple" other learning disabilities, Dr. Solomon opined that Q.C-C. needed, among other things, classes with a smaller teacher-to-student ratio, counseling, and intervention from an occupational therapist and a speech language pathologist, along with systematic instruction in strategies for attention and executive functioning.  AR 274; *see also* AR 751.  Dr. Solomon recommended that Q.C-C.'s parents consider two schools for Q.C-C., one of which was The Lab School of Washington ("Lab"), a private full-time special education day school.  *See* AR 274; AR 751.

Following Dr. Solomon's recommendation, Q.C-C.'s parents unilaterally enrolled Q.C-C. at Lab for the 2011–2012 school year, Q.C-C.'s fifth grade year.  *See* AR 751.  In January 2012, Q.C-C.'s parents filed a due process complaint against DCPS alleging violations of the IDEA and, in June 2012, a hearing officer determined that DCPS denied Q.C-C. a FAPE by failing to invite Q.C-C.'s parents to an IEP meeting in January 2012, by developing an IEP that was not individually tailored to meet Q.C-C.'s needs, and by failing to provide an appropriate educational placement for the second half of the 2011–2012 school year.  *See* AR 39–74 (Hearing Officer Determination dated June 28, 2012).  Finding that Lab was "appropriate" under the IDEA, the hearing officer ordered DCPS to reimburse Q.C-C.'s parents for all costs of Q.C-C.'s attendance

at Lab from January 31, 2012 through August 31, 2012.[2]  *See* AR 71.  Q.C-C. has continued her

education at Lab since the 2011–2012 school year with DCPS continuing to fund her placement.

*See* AR 751.

In October 2013, during Q.C-C.'s seventh grade year at Lab, Q.C-C.'s parents filed

another due process complaint against DCPS, claiming that, despite DCPS's continued funding

of Q.C-C.'s placement at Lab, DCPS had failed to propose a program or placement for Q.C-C.

*See* AR 752.  Q.C-C.'s parents and DCPS settled that complaint in December 2013.  *See id.*; AR

550–52 (settlement agreement signed Dec. 5, 2013).  As part of the settlement, DCPS agreed to

continue paying for Q.C-C.'s placement at Lab through June 19, 2014, evaluate Q.C-C., review

and revise her IEP at a meeting before June 19, 2014, and determine a location of service

following the meeting.  *See* AR 551.  Q.C-C.'s parents agreed to visit the proposed location of

service and retained the right to challenge the proposed IEP and placement.  *See id.*

Pursuant to the settlement, DCPS conducted several reviews and evaluations in April and

May of 2014.  In April 2014, a DCPS school psychologist conducted an evaluation by reviewing

Q.C-C.'s school records, observing Q.C-C. in class for 35 minutes, and interviewing one of Q.C-

C.'s teachers and prepared a report which recommended that Q.C-C. continue to be considered

eligible for special education services under the "Other Health Impairment" designation.  *See* AR

554–60.  A DCPS speech language pathologist, Judith Edgehill, also conducted an assessment by

reviewing records, including test results and questionnaire responses by Q.C-C.'s teachers,

---

[2]      The hearing officer declined Q.C-C.'s parents' request for reimbursement for the entirety
of the 2011–2012 school year, finding that they failed to prove that DCPS denied Q.C-C. a
FAPE, or failed to make a FAPE available, during the fall of 2011.  *See* AR 71.  The Court also
notes that in the separate Hearing Officer Decision appealed here, the Hearing Officer incorrectly
stated that the hearing officer in 2012 ordered DCPS to reimburse Q.C-C.'s parents "from
January 21, 2010 through the end of SY 2011–2012."  AR 751.

observing Q.C-C. in one class, and concluded that Q.C-C. did not have a distinct Speech and/or Language Impairment as a "primary disabling condition" but that DCPS should consider whether Q.C-C. was eligible to receive "oral communication related services."  AR 561–79 (emphasis omitted).  A DCPS occupational therapist conducted an assessment by reviewing records, observing Q.C-C. in class, and conducting interviews and concluded that Q.C-C.'s "decreased muscle tone, endurance and postural stability . . . . combined with inattentiveness and ineffective sensory processing affect her ability to keep pace and fully engage in daily activities."  AR 580–88.  A DCPS social worker also prepared a report based on records, a 35-minute classroom observation, and interviews and concluded that Q.C-C. "is a vulnerable child who requires significant supports to be successful in accessing her academic program and maintaining emotional stability."  AR 589–96.  Alexandra Lemus, Q.C-C.'s fourth-grade special education reading teacher from Oyster-Adams, also observed Q.C-C. for 30 minutes during one of her classes at Lab.  *See* AR 622; AR 753; Tr. Day 2 at 48:20–52:14, ECF No. 8-9.

On April 7, 2014, Lab held an annual meeting to discuss Q.C-C.'s progress and need for support and to revise the IEP for her continued education at Lab.  *See* AR 327; AR 752–53.  DCPS was invited to this meeting but did not attend.  *See* AR 752.  The 2014 Lab IEP called for 31.25 hours of specialized instruction and 3.75 hours of related services per week, which included individual and group speech and language therapy, occupational therapy, and psychological treatment.  *See* AR 327; AR 752–53.

On June 2, 2014, a DCPS team, which included Ms. Lemus, convened an IEP meeting at Oyster-Adams with Q.C-C.'s parents and staff from Lab, and DCPS ultimately drafted a new proposed IEP.  *See* AR 409; AR 421–39 (DCPS IEP dated June 2, 2014); AR 753.  DCPS cited the 2014 Lab IEP throughout its IEP, including, for example, the Lab IEP's statement that Q.C-

C. "struggles to interact with her peers and has some social skills difficulties" and that "[t]his impacts her overall self-esteem which in turn impacts her ability to function in the general education curriculum," AR 432, and the Lab staff agreed with the goals set forth in the DCPS IEP, *see* AR 754.

A sharp disagreement, however, emerged between DCPS and Q.C-C.'s parents and the Lab staff regarding the amount of special education that Q.C-C. requires. *See* AR 753 ("There is just simply a disagreement between DCPS and [Lab] and the student's parents about what it takes to educate the student."). In stark contrast with the Lab IEP, DCPS prescribed only five hours of specialized instruction per week with only one of those hours outside the general education, as well as various related services in occupational therapy, behavioral support, and speech and language pathology with some of those services taking place outside the general education setting. *See* AR 436; AR 753. DCPS justified this proposal by determining that "the previous DCPS IEP hours remained appropriate," because Q.C-C. made adequate progress at Oyster-Adams four years earlier. AR 641; *see also* AR 648–49 ("The IEP Team felt that [Q.C-C.] needs 5 hours of service, as she had on her IEP when she was last at Oyster-Adams Bilingual School because [Q.C-C.] made over two years of progress in Reading that year, and she is Average on the Woodcock Johnson Tests of Achievement in Reading and Math. The lawyer for the family disagreed and argued that [Q.C-C.] needs a full time placement. The IEP with 5 hours was developed by the IEP Team at Oyster-Adams Bilingual School.").

Three days after the DCPS IEP meeting, DCPS informed Q.C-C.'s parents by letter that DCPS had selected Alice Deal Middle School ("Deal"), a public school within the DCPS system, as the location of services for implementing the IEP. *See* AR 650–51. On June 12, 2014, Q.C-C.'s parents, through counsel, formally notified DCPS that they disagreed with and rejected

DCPS's IEP, stating that Q.C-C. "requires significantly more special education services than proposed by the DCPS IEP team," and stating their intention to maintain Q.C-C.'s placement at Lab and seek "ongoing public funding for that placement."  AR 652.  Pursuant to the December 2013 settlement, Q.C-C.'s parents also visited Deal and met with the school's assistant principal to discuss how Q.C-C.'s IEP would be implemented.  *See* Tr. Day 1 at 183:7–184:7.  Based on their observations and conversations with Deal's assistant principal, Q.C-C.'s parents found Deal to be inappropriate for Q.C-C. for a variety of reasons, including the apparent lack of a special education teacher outside math and reading, the large school size, and the lack of support for Q.C-C.'s difficulties with "executive functioning."  *See id.* at 184:1–16; *id.* at 189:3–190:13.

### C.  Administrative Proceeding and the Hearing Officer's Determination

On August 25, 2014, Plaintiffs filed a due process complaint against DCPS, claiming that DCPS denied Q.C-C. a FAPE in two separate ways:  first, by failing to propose an appropriate IEP, specifically by proposing an insufficient amount of specialized instruction; and second, by failing to provide Q.C-C.'s parents with "meaningful participation in the IEP process" by unilaterally selecting Deal as the location of service.  AR 4–11.  Plaintiffs did not challenge the goals contained in the IEP or any components of the IEP other than the prescribed amount of specialized instruction outside general education.  *See* AR 750 n.5.  As a remedy, Plaintiffs sought, in part, an order requiring DCPS to continue to fund Q.C-C.'s placement at Lab.  The Hearing Officer ordered DCPS to continue to fund Q.C-C.'s placement at Lab during the pendency of the complaint process pursuant to the "stay put" provision of the IDEA.  *See* Order on Motion for Stay Put Protections, AR 242– 48.

A hearing on the due process complaint was held on December 4 and December 5 of 2014 before Hearing Officer Coles B. Ruff.  *See* AR 747.  At the hearing, Plaintiffs presented

testimony from their educational consultant, Dr. Solomon, designated as an expert in "special education programming and placement," as well as one of Q.C-C.'s parents and three Deal staff members, all of whom were designated as experts in their respective fields of speech language pathology, occupational therapy, and "special education programming and placement." AR 768. DCPS presented testimony from an expert speech language pathologist, Ms. Lemus, and the assistant principal of Deal. *See* AR 768–69. The Hearing Officer issued his determination on December 25, 2014. *See* AR 747–70.[3]

    With respect to the first issue presented, the Hearing Officer concluded that DCPS denied Q.C-C. a FAPE by failing to propose an appropriate program or placement. *See* AR 760. In reaching this conclusion, he stated that "[t]he overwhelming evidence demonstrates, despite DCPS witnesses' testimony to the contrary," that Q.C-C. has a wide variety of health concerns that "impact her significantly throughout all classes." AR 762. He found that the Lab staff

---

[3]     On December 26, 2014, the Hearing Officer issued a second version of his determination that maintained the December 25, 2014 issuance date, informing the parties that the second version contained "typographical corrections" and that "[n]o substantive changes ha[d] been made." AR 770; *see* AR 747–69 (corrected Hearing Officer Determination). The parties did not alert the Court to the two different versions of the determination in their briefs, and, though the District cites the corrected version of the determination, Plaintiffs incorrectly cite the original, superseded version throughout their briefs. *See, e.g.,* Mem. Supp. Pls.' Mot. Summ J. at 2 n.1, ECF No. 9 (citing AR 722–44). The Court also observes that despite the Hearing Officer's statement to the parties, the changes appear to have been more than simply "typographical." Most notably, an entire paragraph of the Hearing Officer's findings of fact was removed from the corrected version. *Compare* AR 727 ¶ 14 *with* AR 752 ¶ 14. Though the Hearing Officer neither specifically informed the parties of this change nor provided an explanation for it, the Court observes that, in the original version, the removed paragraph was repeated, but phrased differently, as a separate paragraph later in the opinion. *Compare* AR 727 ¶ 14 *with* AR 729 ¶ 20. In the corrected version, the latter paragraph was retained, though with a different paragraph number. *See* AR 753 ¶ 19. The removal of the paragraph (and the other changes) did not have a substantive impact on the Hearing Officer's analysis, and none of the changes substantively affect the Court's analysis here either. Nevertheless, when hearing officers make such changes to their decisions, it is appropriate for them to fully inform the parties on the record of the changes to avoid creating unnecessary confusion for the parties and the courts.

members "credibly testified that [Q.C-C.] benefits from the level of intervention and low student

to teacher ratio the student has at [Lab]." *Id.* As to DCPS's IEP, he stated:

> The Hearing Officer is incredulous that DCPS would base the
> amount of specialized instruction in the student's current IEP on the
> amount of services that she received nearly four years prior rather
> than taking into account that [sic] the student's current instructional
> performance and crafting an individualied [sic] education program
> that meets the student's needs where she is operating currently.

AR 762.  He further found that "there was credible testimony that the extensive goals that are in

the student's DCPS IEP that [Lab] helped draft cannot be implemented in the scant number of

hours of specialized instruction in the DCPS IEP as it was drafted on June 2, 2014." AR 763.

Though the Hearing Officer found, based on "overwhelming evidence," that Plaintiffs

had established that DCPS denied Q.C-C. a FAPE by providing an insufficient number of hours

of specialized instruction in her IEP, he nonetheless declined to order the equitable remedy that

Plaintiffs sought:  prospective placement at Lab.  *See* AR 762–64.  Instead, he struck a middle

ground and chose to amend Q.C-C.'s IEP to prescribe "at least 25 hours of specialized [sic]

isntruction [sic] outside general education per week." AR 763.  The Hearing Officer justified

this result by stating that he was "not convinced that [Q.C-C.] must be totally removed from her

non-disabled peers and that a separate school is the student's least restrictive environment on the

continuum of placements." AR 763–64.  He reached this determination by considering two

pieces of evidence:  first, testimony concerning Q.C-C.'s physical education class at Lab; and

second, Q.C-C.'s parent's testimony concerning Q.C-C.'s interaction with non-disabled peers in

extracurricular activities.  *See id.*

The Hearing Officer ruled for DCPS on the second issue raised by Plaintiffs and

concluded that Plaintiffs did not prove by a preponderance of the evidence that DCPS also

denied Q.C-C. a FAPE by failing to provide Q.C-C.'s parents with meaningful participation in the IEP process.  *See* AR 764.

Plaintiffs timely instituted this action pursuant to the IDEA, challenging the Hearing Officer's determination in part, in March 2015.[4]  *See* Compl., ECF No. 5.  The Complaint requests as relief:  (1) judgment for Plaintiffs and against the District; (2) a declaration that the District violated Plaintiffs' rights; (3) an order directing the District to reimburse Plaintiffs for the tuition expenses and costs incurred in enrolling Q.C-C. at Lab during the 2014–2015 school year; (4) an order directing the District to place and fund Q.C-C. at Lab; (5) an order directing the District to pay Plaintiffs' reasonable attorneys' fees and costs; and (6) any other relief that the Court deems just.  *See id.* at 9–10.

### III.  STANDARD OF REVIEW

Following an administrative proceeding under the IDEA, any party that is "aggrieved by the findings and decision" of the hearing officer may bring a civil action in federal court.  20 U.S.C. § 1415(i)(2).  The IDEA provides that the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  *Id.* § 1415(i)(2)(C); *see also* 34 C.F.R. § 300.516(c).  The IDEA gives courts "broad discretion" to fashion remedies for IDEA violations.  *Florence Cnty. Sch.*

---

[4]      Plaintiffs' Complaint does not challenge the Hearing Officer's determination on the second claim asserted in their original due process complaint.  The Complaint delineates three counts:  Count I for failure to provide a FAPE, Count II for failure to develop an appropriate IEP, and Count III for failure of the Hearing Officer to render a proper decision.  *See* Compl. at 8–9.  The parties, however, do not address these counts in their summary judgment motions, briefing, or proposed orders or otherwise suggest that these are brought as distinct causes of action.  The Court will likewise consider these counts collectively.

*Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 16 (1993); *accord Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).

In a civil action challenging a hearing officer's determination under the IDEA, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Where, as here, neither party submits additional evidence for the court's review, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997); *accord Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012); *see also G.G. ex rel. Gersten v. District of Columbia*, 924 F. Supp. 2d 273, 277–78 (D.D.C. 2013) ("[R]ather than applying the typical standard applicable to a summary judgment motion . . . the court in an IDEA case conducts a summary adjudication.").

The D.C. Circuit has explained that, given the court's power to hear new evidence and to base its decision on a preponderance of the evidence standard, the "IDEA plainly suggests less deference than is conventional in administrative proceedings." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)) (alteration and internal quotation marks omitted); *see also id.* ("[J]udicial review under [the] IDEA is more rigorous than in typical agency cases . . . ."). Courts must afford "due weight" to the state administrative proceedings and avoid "substitut[ing] their own notions of sound educational policy for those of the school authorities they review." *Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). And, "a court

upsetting the [hearing] officer's decision must at least explain its basis for doing so." *Reid*, 401 F.3d at 521 (citation omitted).

At the same time, however, "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Id.* (quoting *Kerkam*, 931 F.2d at 87); *see also M.O. v. District of Columbia*, 20 F. Supp. 3d 31, 40 (D.D.C. 2013) ("[W]hile a certain amount of deference should be accorded to the knowledge and expertise of the hearing officer, courts will accord less deference if the hearing officer's determination lacks reasoned and specific findings."). Moreover, "[a] court is obligated by the IDEA to ensure that [the] relief set forth in the administrative award was appropriate" and the court "may not simply rely on the Hearing Officer's exercise of discretion." *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 36 (D.D.C. 2013) (internal quotation marks and citations omitted). The party challenging the hearing officer's decision "take[s] on the burden of persuading the court that the hearing officer was wrong." *Id.* at 35 (internal quotation omitted).[5]

---

[5]     In their summary judgment briefing, the parties debate the meaning of two non-binding decisions from outside this Circuit concerning the applicable standard of review. The first is *Doyle v. Arlington County School Board*, in which the Fourth Circuit afforded no weight to a reviewing state officer's reasoning that was "so far from the accepted norm of a fact-finding process designed to discover truth" and stated that "findings of fact by the hearing officers . . . are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." 953 F.2d 100, 104–05 (4th Cir. 1991). The second case is *Teague Independent School District v. Todd L.*, in which the Fifth Circuit acknowledged the need for courts to give "due weight" but "explicitly adopt[ed] the view that the district court's review of the hearing officer's decision is virtually *de novo*[.]" 999 F.2d 127, 130–31 (5th Cir. 1993). The Court need not offer an opinion here on these courts' formulations of the standard of review, because the law in this Circuit as to the proper standard of review is clear and well-established. The Court does not take a position as to whether *Doyle* or *Teague* conflict with the law in this Circuit.

## IV.  ANALYSIS

The Court first clarifies the issues before it and the proper standard for consideration of whether to award a prospective placement, before turning to its review of the Hearing Officer's determination and analysis of the record.

### A.  Issues Presented and Disputed

The Court begins by identifying the issues presented in this action.

Though Plaintiffs argue as a section heading in their motion for summary judgment that "The Court Must Make an Independent Determination of Whether DCPS Provided Q.C-C. With a FAPE," they simultaneously assert that the "sole issue here is the appropriateness of the Hearing Officer's award" and that the "Hearing Officer's findings and conclusions as to the inappropriateness of Q.C-C.'s program and placement are not before this Court and therefore should not be disturbed."  Mem. Supp. Pls.' Mot. Summ J. ("Pls.' Mem. Supp.") at 8–10, ECF No. 9.  The District similarly makes clear (and, in the Court's view, for good reason) that it does not challenge the Hearing Officer's conclusion that DCPS denied Q.C-C. a FAPE "when it offered an inadequate educational placement."[6]  Def.'s Mem. P. & A. Supp. Def.'s Opp'n Pls.' Mot. Summ. J. & Def.'s Cross-Mot. Summ. J. ("Def.'s Mem. Supp.") at 4, ECF No. 11.  The Court will therefore leave the Hearing Officer's determination that DCPS denied Q.C-C. a FAPE

---

[6]     The District's description of the Hearing Officer's conclusion is imprecise.  Though the Hearing Officer stated that Plaintiffs had proven that DCPS denied QCC a FAPE by "failing to propose an appropriate program or placement," the remainder of the decision indicates that his focus was on DCPS's IEP, rather than the proposed placement at Deal, though even this is less clear as the Hearing Officer did not discuss the adequacy of Deal.  *See, e.g.,* AR 763 (concluding that "the IEP DCPS developed was not reasonably calculated to provide the student educational benefit at the time it was developed and based upon the information available to the IEP team on June, 2014"); AR 764 (ordering DCPS to meet with Plaintiffs and "make a determination regarding the student's educational placement and location of services").

intact and proceed on that basis, limiting its analysis in this case to the appropriateness of the

Hearing Officer's equitable remedies for the now-uncontested violation of the IDEA.

Plaintiffs' Complaint seeks an order requiring the District "to reimburse plaintiffs for the

tuition expenses and costs incurred in enrolling Q.C-C. at The Lab School of Washington for the

2014–2015 school year" and an order directing the District to "place and fund" Q.C-C. at Lab.

Compl. at 10.  The District argues that the claim for reimbursement is not before the Court

because it was neither presented to the Hearing Officer nor addressed in the Hearing Officer's

determination and, even if it was presented or addressed, the issue is now moot.

"[A] party must pursue all administrative avenues of redress" under the IDEA before

seeking judicial review.  *Cox v. Jenkins*, 878 F.2d 414, 419 (D.C. Cir. 1989).  "To excuse a

failure to exhaust the plaintiff must demonstrate the futility or inadequacy of the administrative

process."  *Douglas v. District of Columbia*, 65 F. Supp. 3d 225, 228 (D.D.C. 2014) (citation

omitted).  Even if the claim has been first pursued through administrative channels, "the

mootness doctrine prohibits [the Court] from deciding a case if 'events have so transpired that

the decision will neither presently affect the parties' rights nor have a more than speculative

chance of affecting them in the future.'"  *District of Columbia v. Doe*, 611 F.3d 888, 894 (D.C.

Cir. 2010) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)).

As a preliminary matter, the Court observes that Plaintiffs do not address the District's

administrative exhaustion and mootness arguments in their joint reply and opposition brief and,

in fact, do not even reference, let alone reiterate, their request for reimbursement in that brief.[7]

*See* Pls.' Opp'n Def.'s Cross-Mot. Summ. J. & Reply Def.'s Opp'n Pls.' Mot. Summ. J. ("Pls.'

---

[7]        Plaintiffs do, however, discuss the applicability of the standard for ordering
reimbursement to the determination of whether to award a prospective placement.  That separate
issue is discussed, *infra*.

Reply"), ECF No. 13.  "It is well understood in this Circuit that when a plaintiff files an

opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a

court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v.

Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing

*FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997); *Stephenson v. Cox*, 223 F. Supp. 2d 119,

121 (D.D.C. 2002)).

Nevertheless, the District appears to be only partially correct.  Plaintiffs' claim and

request at the administrative level for "funding" Q.C-C.'s placement at Lab, *e.g.,* AR 9, can be

construed as inclusive of a claim for reimbursement, and the Court therefore finds that Plaintiffs

did not fail to exhaust their administrative remedies with respect to reimbursement.  *See K.B. v.

District of Columbia*, No. 13-0649, 2015 WL 5191330, at *8 (D.D.C. Sept. 4, 2015) (construing

request for "fund[ing]" to include request for reimbursement despite absence of the phrase

"tuition reimbursement").  The record is clear, however, that DCPS was ordered to continue

funding Q.C-C.'s placement at Lab during the pendency of the administrative proceeding, *see*

AR 242– 48, and Plaintiffs do not contest the District's statement that DCPS has continued to

fund Q.C-C.'s placement at Lab during the pendency of this action.  Therefore, the Court finds

that any claim for reimbursement is moot, and the Court considers only Plaintiffs' request for

prospective placement at Lab.[8]

---

[8]    In cursory fashion at the end of their joint opposition and opening summary judgment
brief, the District also argues that Plaintiffs' request for prospective placement and funding is
also "an inappropriate attempt to get around administrative exhaustion remedies," because "[t]he
district court does not have authority to address school years that have not first been addressed in
an administrative hearing."  Def.'s Mem. Supp. at 11–12.  The District offers no further
reasoning or detail for this argument, apart from an unexplained citation to *Pinto v. District of
Columbia*, 69 F. Supp. 3d 275 (D.D.C. 2014), and the District does not raise the argument again
in their reply brief.  "It is not enough merely to mention a possible argument in the most skeletal

## B.  Standard for Considering Prospective Placement

Before reviewing the Hearing Officer's determination to not award Plaintiffs' requested relief of placement at Lab and making its own assessment, it is necessary for the Court to first set forth the standard by which a court or hearing officer should determine whether to award a prospective placement.  It is particularly important to do so here, in which Plaintiffs, the District, and the Hearing Officer have offered conflicting standards.

The IDEA requires the Court to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(C)(iii), and "the court enjoys 'broad discretion'" in fashioning equitable relief under this provision, *Florence*, 510 U.S. at 16 (quoting *Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 369 (1985)).  This includes the discretion to order prospective relief in the form of awarding placement at a private school "aimed at ensuring that the child receives *tomorrow* the education required by the IDEA."  *Branham v. Gov't of the Dist. of Columbia*, 427 F.3d 7, 11 (D.C. Cir. 2005).  The Supreme Court has stated that, in fashioning discretionary equitable relief, courts "must consider all relevant factors."  *Florence*, 510 U.S. at 16.  In *Branham*, the D.C. Circuit identified a non-exclusive set of "relevant" factors for courts to consider in determining whether to order a particular placement:  (1) "the nature and severity of the student's disability"; (2) "the student's specialized educational needs"; (3) the link between those needs and the services offered by the private school"; (4) the cost of the placement; and (5) "the extent to which the placement represents the least restrictive educational environment."  *Branham*, 427 F.3d at 12 (citations omitted).  The D.C. Circuit has also affirmed a prospective placement award without reference to any particular factors in a case in which the district court

_____

way, leaving the court to do counsel's work."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

found that the placement was "the best . . . offered by either DCPS or the parents" and was, therefore, "the only program supported by any evidence in the record." *McKenzie v. Smith*, 771 F.2d 1527, 1535 (D.C. Cir. 1985).

In their opening brief in support of their motion for summary judgment, Plaintiffs recognized *Branham* as controlling and stated that "[t]his jurisdiction appears unique in its distinction between reimbursement and placement." Pls.' Mem. Supp. at 13. In their joint reply and opposition brief, however, Plaintiffs take a different position, arguing that, following the D.C. Circuit's decision in *Leggett v. District of Columbia*, 793 F.3d 59 (D.C. Cir. 2015), a "new and more specific standard" applies in which "placement and/or reimbursement at the unilateral placement is the appropriate relief" when "no other placement is offered and the parental placement meets the *Rowley* standard." Pls.' Reply at 1–3. Plaintiffs further argue that, pursuant to *Leggett*, it is not necessary consider the "least restrictive environment." *See id.* at 6. The District, on the other hand, argues that the standard for reimbursement is inapplicable and that the least restrictive environment analysis is controlling. *See* Def.'s Mem. Supp. at 7–9. The District does not cite *Branham* or otherwise reference any of its other factors. The District's position is in line with the approach of the Hearing Officer, who ignored *Branham* and its other factors, focusing exclusively on the least restrictive environment factor. *See, e.g.,* AR 763 ("At [Lab] the student has no interaction with students who do not have a disability. IDEA clearly mandates that to the greatest extent possible students shall be educated with their non-disabled peers.").

Both sides have missed the mark here. *Branham*, which provides for consideration of the least restrictive environment as a relevant factor, is and remains good law with respect to ordering prospective placement as a discretionary equitable remedy. Plaintiffs misread the D.C.

Circuit's decision in *Leggett* as somehow overturning *Branham* and its factors. Nothing in the *Leggett* opinion lends itself to such a dramatic interpretation, and the two cases, along with the D.C. Circuit's earlier opinion in *McKenzie*, can be read harmoniously.

The D.C. Circuit defined the issue in *Leggett* as follows: "When a parent chooses, without school officials' consent, to send her child to a private school, under what circumstances must the school district reimburse the parent for the costs of attending that school?" *Leggett*, 793 F.3d at 62. The Circuit held that, in determining whether to order reimbursement, courts should apply the same standard for determining whether a school district's IEP is "proper under the Act": "a parent's unilateral private placement is proper under the Act so long as it is 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* at 71 (quoting *Rowley*, 458 U.S. at 207). The Circuit held that the parents in that case were entitled to reimbursement because the placement they chose "was the only placement on the record that could have provided [the child] with an education that met her identified needs." *Id.* at 72.

The fact that, in *Leggett*, a case that did not involve prospective placement, the Circuit did not reference the *Branham* factors for prospective placement is unsurprising and certainly does not mean that *Branham* is no longer good law. On the contrary, the *Leggett* court actually *cited* another portion of *Branham* in its opinion. *See id.* at 70 (citing *Branham*, 427 F.3d at 9). The Circuit also cited *McKenzie* as precedent, which the Circuit also cited in *Branham*, further indicating that the three cases can be read together. *See id.* at 72 (citing *McKenzie*, 771 F.2d at 1535); *Branham*, 427 F.3d at 12 (citing *McKenzie*, 771 F.2d at 1531). Had the Circuit intended to overrule the prospective placement portion of its opinion in *Branham*, it would have said so.

At the same time, the District's apparent position that reimbursement cases such as *Leggett* are wholly irrelevant to the prospective placement analysis is also incorrect. In

*Branham*, most of the cases cited by the D.C. Circuit as support for the prospective placement factors concerned only reimbursement. *See Branham*, 427 F.3d at 12 (citing *Carter*, 510 U.S. at 16; *Holland v. District of Columbia*, 71 F.3d 417, 425 (D.C. Cir. 1995); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998)).   And although *Leggett* involved only reimbursement, the D.C. Circuit likened its decision to its prior decision in *McKenzie* upholding a district court's order of private placement without drawing a relevant distinction. *See Leggett*, 793 F.3d at 72 (citing *McKenzie*, 771 F.2d at 1535).   Moreover, the Court notes that the case principally relied on by the District as "remarkably similar" involved only reimbursement. Def.'s Mem. Supp. at 10 (citing *N.T. v. District of Columbia*, 839 F. Supp. 2d 29, 35 (D.D.C. 2012)); *see N.T.*, 839 F. Supp. 2d at 30–31 ("The question is whether [DCPS] can provide N.T. with a [FAPE] and, if not, to what extent it must reimburse N.T.'s parents for her private school placement.").   Though the purposes of each form of relief are distinct, the considerations involved often overlap to some degree.

The parties, and the Hearing Officer, also misunderstand the proper role of the "least restrictive environment" in the analysis.   Plaintiffs' assertion that whether the desired placement is the least restrictive is irrelevant in light of *Leggett* is, for the reasons explained, simply incorrect.   The District, like the Hearing Officer, on the other hand, relies almost entirely on the least restrictive environment factor to support its argument, and that, too, is incorrect.

The District cites the Fourth Circuit's statement that "[m]ainstreaming of handicapped children into regular school programs where they might have opportunities to study and to go socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act." *De Vries v. Fairfax Cty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989).   The District fails to acknowledge, however, the Supreme Court stated in *Rowley* that "[d]espite this preference for

'mainstreaming' handicapped children—educating them with nonhandicapped children—
Congress recognized that regular classrooms simply would not be a suitable setting for the
education of many handicapped children." *Rowley*, 458 U.S. at 181 n.4.  For that reason, the
Fourth Circuit has also recognized that "mainstreaming is a policy to be pursued so long as it is
consistent with the Act's primary goal of providing disabled students with an appropriate
education" and that "[w]here necessary for educational reasons, mainstreaming assumes a
subordinate role in formulating an educational program." *Carter By & Through Carter v.
Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991) (citing *Rowley*, 458 U.S. at 181
& n.4; *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044–45 (5th Cir. 1989)), *aff'd sub nom.
Florence*, 510 U.S. 7.  As the court stated in *Roark*, "'the key consideration is whether the
placement is appropriate under the IDEA,' not whether it is the least restrictive." *Roark ex rel.
Roark v. District of Columbia*, 460 F. Supp. 2d 32, 43 (D.D.C. 2006) (quoting *Schoenbach v.
District of Columbia*, Civ. No. 15-1591, 2006 WL 1663426, at *7 (D.D.C. June 12, 2006)).

Indeed, the very text of the IDEA clarifies that the least restrictive environment is
required "[t]o the maximum extent appropriate" and that special classes and separate schooling
are permitted when "the nature or severity of the disability of a child is such that education in
regular classes with the use of supplementary aids and services cannot be achieved
satisfactorily." 20 U.S.C. § 1412(a)(5)(A).  Finally, the District and the Hearing Officer have
failed to recognize that "the Act's preference for mainstreaming was aimed at preventing *schools*
from segregating students from the general student body" and was "not meant to restrict *parental*
options when the public schools fail to comply with the requirements of the Act." *Carter*, 950
F.2d at 160.

With these standards in mind, the Court reviews the Hearing Officer's conclusions and the administrative record.

### C.  Review of the Hearing Officer's Conclusions and Analysis of the Record

Turning to the merits of this case, the Court begins by reviewing the Hearing Officer's determination with respect to the ordered remedy and the reasoning he provided in support in order to determine how much weight, if any, is "due" with respect to his determination regarding the appropriate remedy.  *Rowley*, 458 U.S. at 206.  The Court then reviews the record on its own in light of that determination.

### 1.  Deference Afforded to the Hearing Officer's Determination

The Court begins with the Hearing Officer's determination and finds that it is entitled to little, if any, deference on the issue presented, because it was premised on a misunderstanding of the law, as discussed, *supra*, as well as a misunderstanding of the factual record and because it contained insufficient reasoning.

As a preliminary matter, it is difficult to even discern what the Hearing Officer envisioned for Q.C-C. when he ordered her IEP to be amended to "prescribe 25 hours per week of specialized instruction outside general education in addition to the current related services." AR 764.  In a footnote, the Hearing Officer stated that he arrived at the 25 hours per week figure by "excluding the number of related service hours prescribed in the student's IEP from the total number of instructional hours per week that is typically in a DCPS IEP based upon 27.5 hours per week of instruction."  AR 763 n.18.  As Plaintiffs observe (and the District does not address), the Hearing Officer did not provide any citation to the record to support his assumption as to the "typical[]" IEP.  *See* Pls.' Mem. Supp. at 15 n.3.  As Plaintiffs also observe, it is not clear which classes Q.C-C. would attend in a mainstream environment under the Hearing Officer's amended

IEP. *See id.* at 22 n.4.  Plaintiffs assume that "based on his analysis of the PE class and the fact that lunch is not typically included in the IEP . . . these are the classes for which she would be in the mainstream without support." *Id.*  The Court agrees with this analysis, particularly in light of the District's failure to offer another interpretation or otherwise address this issue in its briefing. In any case, the fact that the parties and the Court are forced to draw such an inference makes clear that the Hearing Officer did not provide sufficient detail or reasoning in making his determination, thereby entitling the determination to even less deference than under normal circumstances.

The Hearing Officer failed to provide sufficient reasoning in other ways.  Inexplicably, the Hearing Officer's determination contains two similar, yet alternate, versions of reasoning for his decision to decline to order a prospective placement.  *See* AR 463–64.

In the first version, the Hearing Officer stated that, although the Lab staff, Plaintiffs' educational consultant, and one of Q.C-C.'s parents testified that Q.C-C. would be "overwhelmed" in a general school setting, he "was not convinced by their testimony that the student must be totally removed from her nondisabled peers despite her need for and benefit from specialized instruction in all her classes."  AR 763.  While he observed that, at Lab, Q.C-C. "has no interaction with students who do not have a disability," he stated, without providing any citation to the record or any specifics, that "[t]here is evidence that the student can and does have social interaction with non-disabled peers outside school and in those situations is coached by her parents on peer interaction and communication." *Id.*  He also stated that, at Lab, Q.C-C. "is sometimes in a class with as many as 23 students and it appears that not all the instruction provided to [her] is provided by special educaiton [sic] teachers." *Id.*  He stated that he based his conclusion on this evidence.  *See id.*

Immediately following this explanation, the Hearing Officer provided an alternate version, completely disconnected from the first version. *See* AR 763–64. In this second version, he cited expert testimony, "among others," "that [Q.C-C.] requires total removal from general education" but stated that he did not find this testimony "convincing." AR 763. He then stated, in contrast with the first version, that, at Lab, Q.C-C. "takes physical education with a group as large as 23 students and this instruction is not conducted by special education teacher [sic]" and noted that the "IDEA defines special education to include instruction in physical education." *Id.* The Hearing Officer stated that his conclusion was "[b]ased upon these factors" and did not mention testimony concerning Q.C-C.'s extracurricular activities.

The Hearing Officer's reasoning is not supported by his own findings of fact. His discussion of Q.C-C.'s classes at Lab, which seems to have been the primary justification for his conclusion, appears to have been referring to the following finding of fact: "At [Lab], the student receives specialized instruction and related services and her classes are instructed by special eudcation [sic] teachers. However, it is unclear whether the student's drama and physical education teachers are special education certified." AR 757. This factual finding fits *neither* version of his reasoning. In the first version, he stated that "*it appears* that not all the instruction provided to [her] is provided by special educaiton [sic] teachers." AR 763 (emphasis added). His factual finding, however, was that *all* of Q.C-C.'s teachers were special education teachers, but that it was "unclear" whether her physical education and drama teachers were *certified* in special education. AR 757. The second version, in which he went so far as to state that Q.C-C.'s physical education class "*is not* conducted by special education teacher [sic]" is plainly incorrect. *Id.* (emphasis added).

Even if the Hearing Officer had correctly understood his own finding of fact, the actual finding of fact does not support his ultimate conclusion.  As Plaintiffs note, the IDEA does not define "special education" to include only education by certified special education teachers, but rather encompasses a broader range of instruction.  *See* 20 U.S.C. § 1401(29) (defining "special education" to mean "specially designed instruction . . . designed to meet the unique needs of a child with a disability"); *see also* 34 C.F.R. § 300.39(b)(3) (defining "specially designed instruction" without reference to certification); *Leggett*, 793 F.3d at 63 (quoting 20 U.S.C. § 1401(29)).

Moreover, the two sources the Hearing Officer cited for his factual finding (without providing any explanation) do not provide strong support for the finding or his conclusion.  The Hearing Officer cited a Certificate of Approval for Lab approving Lab as a "nonpublic special education school program."  AR 496–97.  He also cited generally, without any pincite or quotation, the testimony of Megan Van Dyke, the Associate Head of Lab's junior high school. *See* AR 757; AR 768.  He appears to have relied on the following answer by Ms. Van Dyke when asked whether the physical education and drama classes were taught by "special education certified instructors":  "I cannot speak to the PE instructor and the drama teacher, I'm not sure, I don't want to say either way."  Tr. Day 1 at 168:15–19.  Ms. Van Dyke also testified, however, that Q.C-C.'s physical education class was one in which "we see a lot of the anxiety and [Q.C-C.'s] struggle to apply strategies and navigate social dynamics which impact her ability to be present for instruction."  *See id.* at 164:14–18.  This is, at best, weak support for the Hearing Officer's finding of fact, and it did not warrant significant weight in the analysis.

The only other evidence relied upon by the Hearing Officer (and only in the first version of his reasoning)—Q.C-C.'s extracurricular activities—is similarly problematic for his

conclusions.  Though the Hearing Officer did not cite any portion of the record in his reasoning,

he appears to have been referencing the following finding of fact:  "The student currently has

exposure to non-disabled students outside of school through the Washington Ethical Society and

Girl Scouts.  The student has to be coached on how to deal with her peer interactions and what to

say."  AR 759.  The Hearing Officer did nothing more than paraphrase his finding of fact as his

reasoning, offering no additional detail.  The sole source for this finding of fact was the

testimony of one of Q.C-C.'s parents, who stated that Q.C-C. attends the Washington Ethical

Society meetings once per week and that there are ten or fewer girls in her Girl Scout troop.  *See*

Tr. Day 1 at 185:2–11.  Moreover, the Hearing Officer failed to acknowledge or address his own

related finding of fact that, even in department stores, Q.C-C. "gets overstimulated" and that

"when the student is having a tough time academically she leaves the classroom and skips class

and this behavior may likely increase in a setting as large as [Deal]."  AR 759.  And the parent

further testified that, not only did both parents need to coach Q.C-C. on her social interactions,

but that one of them also accompanies her on sleepovers with the Girl Scouts "because she does

have difficulty with sustained social interaction even in a small group like that."  *Id.* 185:20–

186:3.  The Hearing Officer did not address these issues, let alone explain how this testimony

demonstrated that, despite significant expert testimony to the contrary, Q.C-C. could handle a

general education setting without her parents.

     For these reasons, the Court finds that the Hearing Officer's decision is entitled to little

deference.  *See Reid*, 401 F.3d at 521 ("[A] hearing decision 'without reasoned and specific

findings deserves little deference.'" (quoting *Kerkam*, 931 F.2d at 87)); *M.O.*, 20 F. Supp. 3d at

40 ("[W]hile a certain amount of deference should be accorded to the knowledge and expertise

of the hearing officer, courts will accord less deference if the hearing officer's determination

lacks reasoned and specific findings.").

### 2. The Court's Conclusion Based on the Administrative Record

The Court concludes, upon its consideration of the entirety of the administrative record

and the parties' arguments, that the preponderance of the evidence supports a finding that Q.C-C.

requires full-time specialized instruction throughout the school day and, given that Lab is the

only potential placement in the record that could satisfy Q.C-C.'s needs, an order directing the

District to fund Q.C-C.'s continued placement at Lab is warranted.

There is a wealth of evidence in support of Plaintiffs' position, including substantial

expert testimony. For example, Ms. Van Dyke, a designated "expert in special education

programming and placement," administrator at Lab, and Q.C-C.'s former social studies teacher,

AR 768, opined that Q.C-C. could not be appropriately educated in a less restrictive setting than

at Lab. *See* Tr. Day 1 at 165:12–14. She further testified that Q.C-C. "has difficulty

transitioning into classes and in between tasks" and that she "needs a lot of structure and a lot of

processing time." *Id.* at 151:18–22. She also testified to the effect of Q.C-C.'s disabilities on her

social interactions, stating that Q.C-C. is "socially and emotionally vulnerable." *Id.* at 154:10–

11; *see also id.* at 153:9–13 (stating that Q.C-C. "is often concerned about her peers and social

interaction" and "was more focused on what other students were doing"); AR 758 (Hearing

Officer accepting Ms. Van Dyke's opinion on these issues as fact). As noted, *supra*, she also

testified that physical education—by far Q.C-C.'s largest class—presented particularly difficult

issues for Q.C-C. *See id.* at 164:14–18.

Ms. Solomon, Plaintiffs' retained expert in special education who has observed Q.C-C.

every year since she was in the fourth grade at Oyster-Adams, testified that "there are no areas of

academic skill development, social development, [or] executive and attentional development" in which Q.C-C. does not need specialized instruction and related services. *Id.* at 47:6–10. Perhaps most significantly here, Ms. Solomon further testified that even lunch "is fraught with difficulty for [Q.C-C.]," explaining that Q.C-C. "hoards food" and "doesn't always eat when she's supposed to" and that she "has difficulty with social interactions." *Id.* at 65:7–14. Ms. Solomon testified that lunch poses a particular problem because it is "less structured." *Id.* at 12–14. She also testified to Q.C-C.'s need for support with respect to physical education. *See id.* at 66:21-67:14. Ms. Solomon also testified that Q.C-C. would have difficulty in a general education setting between classes and as the building lets out at the end of the day, because "there's too much moving around the building" and Q.C-C. has a tendency to "disappear." *See id.* at 81:5–82:13.

Melissa Wood, Lab's speech language pathologist, similarly testified to Q.C-C.'s "struggle[s] with peers in particular" and need for "a significant amount of teacher redirection and support." *Id.* at 96:15–97:7. Judy Shincarick, Lab's director of occupational therapy, also testified to her concerns about Q.C-C. not receiving the necessary "redirection" in a general education setting and Q.C-C.'s limited "ability to focus and attend in a large setting." *Id.* at 132:9–133:3.

There is further support provided in the documentary record. For example, an Occupational Therapy Progress Report dated March 2014 stated that Q.C-C.'s "best effort is greatly impacted by her difficulty maintaining attention [to] academic tasks" and that Q.C-C. "tends to become distracted visually by small objects in her workspace as well as by conversations by peers around her." AR 321. Even DCPS's Psychological Triennial Reevaluation dated April 2014 reported that Q.C-C. "struggles to interact freely and easily with

peers and can isolate herself at times" and that "[t]hese weaknesses impact and compromise functioning in the general education curriculum" in a variety of ways.  *See* AR 373–74. Similarly, DCPS's Social Work Assessment Report, also dated April 2014, noted Q.C-C.'s "history of hoarding," AR 381, and stated that "[d]uring lunch, [Q.C-C.] generally sits alone or with her teacher because she does not connect well with her peers," AR 383.  The report concluded that Q.C-C. "is a vulnerable child who requires significant supports in place to be successful in accessing her academic program and maintaining emotional stability."  AR 386. Finally, it is also notable that, in 2012, a Hearing Officer determined that Q.C-C. "needs full-time, specialized instruction outside the general education setting to access the general education curriculum."  AR 159.

The District offers the Court very little evidence in opposition, limiting its argument on this issue to essentially one short paragraph of its brief and almost entirely relying on the same evidence that the Hearing Officer relied on in reaching his determination.  *See* Def.'s Mem. Supp. at 9–10.  The Court has already discussed the Hearing Officer's flawed and insufficient consideration of this evidence in his reasoning, and the District does not offer the Court any further analysis.  The District does not, for example, explain how uncertainty regarding the physical education teacher's special education certification—in a school dedicated entirely to special education—shows that Q.C-C. can handle physical education in a general education setting.  Nor does it explain how Q.C-C.'s after-school participation in Girl Scouts and the Washington Ethical Society with significant parental support advances its position.

Instead, the District simply adds that Ms. Van Dyke and Ms. Wood testified that they had not observed Q.C-C. in a setting outside of Lab.  *See id.* at 10 (citing Tr. Day 1 at 109:2–4; Tr. Day 1 at 166:12–14); *see also* AR 757–58 (Hearing Officer noting the same in his findings of

fact).  While this might be a plausible argument for discounting their expert testimony, the District fails to address Plaintiffs' other expert witnesses, including Dr. Solomon, who has continually observed Q.C-C. since her time at Oyster-Adams.  More importantly, the District does not ask the Court to consider other expert testimony or documentary evidence in opposition to Plaintiffs' experts.  In fact, as discussed, several of the District's own expert reports support Plaintiffs' experts' opinions.  The District simply fails to offer the Court any real evidentiary basis to toss aside the wealth of evidence and expert testimony that support Plaintiffs' position.

The District also offers the Court two prior cases as precedent, but each of these cases is plainly distinguishable from this one, and the distinctions only serve to bolster the Court's analysis.

The District primarily relies upon *Pinto v. District of Columbia*, 69 F. Supp. 3d 275 (D.D.C. 2014), in which Magistrate Judge Robinson,[9] in relevant part, upheld a Hearing Officer's decision to decline to award reimbursement to parents who enrolled their child at Lab.  *See Pinto*, 69 F. Supp. 3d at 284–86.  Despite relying heavily on the case, the District does not actually offer any comparison of the facts and evidence in that case to this one.  Instead, the District simply states that the Magistrate Judge Robinson's decision in *Pinto* to uphold the Hearing Officer's determination because the plaintiffs in that case "failed to identify an error by the Hearing Officer" and the Hearing Officer "considered all of the evidence offered during the hearing, relied upon the applicable authorities, and clearly articulated his findings" is sufficient to "support[] affirming the hearing officer's ruling" in this case.  Def.'s Mem. Supp. at 10 (quoting *Pinto*, 69 F. Supp. 3d at 286).  In stark contrast, as the Court has already discussed, in

---

[9]     The District erroneously states that the case was decided by Judge Friedman.  *See* Def.'s Mem. Supp. at 10.

this case, the Hearing Officer committed several errors, including misunderstanding the legal precedent concerning prospective placement and his own findings of fact, and he failed to consider all of the evidence or adequately articulate his findings. *Pinto*, therefore, only serves to demonstrate the failings of the Hearing Officer in this case.

The District also relies on *N.T. v. District of Columbia*, 839 F. Supp. 2d 29 (D.D.C. 2012), in which Judge Collyer also upheld a Hearing Officer's decision to decline to award reimbursement to parents who enrolled their child at Lab. In particular, the District quotes the following statement:

> Although the District must pay for private school placement "[i]f no suitable public school is available[,] . . . if there is an appropriate public school program available . . . the District need not consider private placement, even though a private school might be *more* appropriate and better able to serve the child." *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991) (citations and quotations omitted).

*N.T.*, 839 F. Supp. 2d at 34 (alterations in original). The District, however, offers the Court no explanation as to how this rule, or Judge Collyer's application of it in *N.T.*, applies to the evidence in this case. In fact, the distinctions between *N.T.* and this case are striking. First, in *N.T.*, Judge Collyer stated that "the parents have not even argued, let alone demonstrated" that the selected DCPS public school could not provide their child with an appropriate education. *Id.* By contrast, as the Court has detailed, Q.C-C.'s parents have provided a wealth of evidence in support of their claim that Q.C-C. requires full-time specialized instruction, while the District has offered virtually none to the Court and has not suggested any alternative public school that might be appropriate. Second, in *N.T.*, the parents' "educational consultant admitted that with substantial intervention, [the child] was able to make educational progress in an inclusive setting" and the "written reports at [the public school] confirm this." *Id.* at 35. Here, of course, Plaintiffs' educational consultant, along with several other expert witnesses, testified that Q.C-C.

needs the full-time support of Lab, and their opinions are supported by documentary evidence.

Third, and finally, in *N.T.*, the parents focused on "extolling the virtues of The Lab School,"

rather than whether their child could receive a FAPE at a public school. *Id.* Here, Plaintiffs'

witnesses and evidence focused not only on Q.C-C.'s progress at Lab, but also her inability to

receive a FAPE in a general education setting.

The Court next considers the *Branham* factors to determine whether prospective

placement at Lab is the appropriate remedy. The first through third factors, which concern the

"nature and severity" of Q.C-C.'s disability, her "specialized educational needs," and the "link

between those needs and the services offered" by Lab, *Branham*, 427 F.3d at 12, counsel in favor

of prospective placement. As the Court has detailed, the administrative record—as well as the

Hearing Officer's own findings of fact—make clear that Q.C-C. suffers from significant

disabilities that affect all facets of her education. Even with the significant amount of specialized

instruction and related support ordered by the Hearing Officer, it appears that Q.C-C. would still

be required to have at least lunch and physical education in a large general education setting, and

she would undoubtedly be required to navigate hallways and have other non-structured

interactions with nondisabled peers. The evidence, including expert testimony, demonstrates that

Q.C-C. would face potentially insurmountable difficulties if the Hearing Officer's proposed IEP

were to be implemented. At Lab, on the other hand, Q.C-C. is able to make progress in a

controlled environment that is sensitive to her unique needs. The District presents no argument

with respect to the fourth *Branham* factor, which concerns the cost of placement at Lab, nor did

they present one before the Hearing Officer.[10]

---

[10]    The Court also notes that the District has been funding QCC's placement at Lab for
several years and that the District has funded several other students at Lab. *See* Day 1 Tr. at

The final *Branham* factor—the extent to which placement at Lab represents the least restrictive environment—is obviously the strongest point of contention between the parties. First, as the Court discussed, *supra*, this factor is of less importance than the IDEA's "primary goal of providing disabled students with an appropriate education," particularly where, as here, it is Q.C-C.'s parents who seek the more restrictive environment.  *Carter*, 950 F.2d at 160.  Most importantly, however, the least restrictive environment factor focuses on the needs of the student, and "Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children."  *Rowley*, 458 U.S. at 181, n.4.  Here, the Court has found that the preponderance of the evidence supports the conclusion that Q.C-C. requires a full-time special education, set apart from the general education population, in order to receive a FAPE.  The least restrictive environment that is *appropriate* for Q.C-C. is Lab.

The Court thus finds that, upon consideration of the *Branham* factors and the entirety of the administrative record, it is appropriate to order relief in the form of a prospective placement. Lab is the only appropriate placement supported by the record, and, therefore, the Court will order the District to place and fund Q.C-C. at Lab for the remainder of the 2015–2016 school year.  *See McKenzie*, 771 F.2d at 1531.

---

150:17–151:1 (testimony by Ms. Van Dyke that Lab has students placed and funded by DCPS); *see also* AR 496 (Lab's Certificate of Approval granted by the District).

**V.  CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Plaintiffs' Motion for Summary

Judgment (ECF No. 9) and **DENY** Defendant's Motion for Summary Judgment (ECF No. 11).

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  February 16, 2016                                        RUDOLPH CONTRERAS
                                                                United States District Judge